UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TERESA R. MARX,

                    Plaintiff,

          v.                                              Case No. 17-C-191

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                    Defendant.

## DECISION AND ORDER

Plaintiff Teresa Marx filed this action for judicial review of a decision by the Commissioner of Social Security denying her applications for disability, disability insurance benefits (DIB), and supplemental security income (SSI) under Titles II and XVI of the Social Security Act. She contends that the decision is not supported by substantial evidence. In particular, she asserts that the Administrative Law Judge (ALJ) failed to properly evaluate the physical and mental components of her Residual Functional Capacity (RFC), allocated insufficient weight to the opinion of a treating nurse practitioner, and improperly evaluated her subjective symptoms of impairment. For the reasons set forth below, the decision of the Commissioner will be reversed.

## BACKGROUND

Plaintiff filed applications for disability, DIB, and SSI on May 28, 2013, alleging that she has been disabled since April 26, 2013, as a result of degenerative disc disease, neck and back problems, anxiety, memory loss, incontinence, and muscle spasms. R. 141, 345. She is 5' 11" tall and weighed approximately 309 pounds on the date of the hearing. R. 141, 1027. Although Plaintiff lived in

Georgia at the time she originally filed her applications, she has since moved to Green Bay, Wisconsin, where she lives in an apartment with two of her sons. R. 219, 1003–04.

In October 2013, Plaintiff's benefits applications were denied both initially and on reconsideration. R. 345. An ALJ affirmed the denial, but the Appeals Council reversed the ALJ's decision and remanded for further consideration of her applications. R. 18, 363–65. Shortly before the date scheduled for the new hearing on remand, Plaintiff amended her alleged onset date to June 1, 2014, a few days short of her fiftieth birthday. R. 18. ALJ Jeffry Gauthier subsequently held the hearing on remand on February 22, 2016. R. 995. Both Plaintiff, who was represented by counsel, and a vocational expert (VE) testified at the hearing. R. 996.

Plaintiff testified that in the years prior to her alleged onset date she worked primarily as a substitute school bus driver. R. 1008–09. However, she also has a certificate in early childhood education from Georgia Technical College, and she previously worked part time as a nursery school supervisor in addition to her work as a bus driver. R. 1007–10. With regard to her work as a bus driver, she noted that several job duties aggravated the pain from her alleged impairments, particularly bending to conduct bus inspections and to buckle into place wheelchairs used by students with disabilities. R. 1030–31.

At the hearing, Plaintiff identified knee pain as the most severe of the medical conditions that allegedly keep her from working. R. 1010–11. Her primary problems come from her left knee, which has no cartilage. R. 1011. Her right knee is also degenerating, but at a slower pace. R. 1016. Although she has received cortisone and Euflexxa injections, those treatments are no longer effective. R. 1011. She has been told by a doctor that a left knee replacement will be the next step to address her pain, but on the date of the hearing she had not yet made concrete plans to have the

surgery. R. 1012–14. The knees cause her constant pain. R. 1014. She sometimes loses her balance, and she generally uses either a cane or a walker when walking. R. 1014–15. When she goes to the grocery store once or twice a month, she also uses the motorized scooters that are available. R. 1031–32. Cold weather, bending, sitting, and standing all aggravate her knee pain. R. 1031.

Plaintiff identified pain in her feet and back as her next most disabling impairments. R. 1016–17. She has tendinitis in her right foot, and she wears a brace and orthotics for both feet. *Id.* As for her back, she experiences pain as a result of a degenerative disc in her lower back. R. 1017. Pain from the lower back also radiates up into her middle back and neck in the form of muscle spasms. R. 1018. She has received an epidural for the back pain, and a doctor has prescribed her hydrocodone with acetaminophen. *Id.* Related to these conditions, Plaintiff testified that both her knee doctor and her foot doctor have advised that her weight may exacerbate her pain. R. 1025–26.

As for mental impairments, Plaintiff testified that she experiences mood swings. R. 1019. She said that these occur approximately three times each week. R. 1020. When the mood swings occur, she testified that she becomes sad quickly, usually when thinking about the recent death of her sister or when she becomes confused. R. 1020–21. She testified that these mood swings have gotten progressively worse since they first started occurring in 2003. R. 1021. Medication has not improved her mental health conditions, and she testified that her prescribed medications do not work approximately two days each week. R. 1022–24.

Plaintiff testified that her typical day begins around 10 a.m., at which time she eats breakfast and takes her medication. R. 1029. She then goes back to sleep for several hours, arising again

around 4 p.m., when her son gets home from school. *Id.* After talking with her son and taking her evening medication, she then sleeps for up to another three hours. *Id.* Although she previously swam for approximately twenty minutes once a week in an effort to reduce her weight, she testified that, at the time of the hearing, she was not swimming or otherwise exercising due to difficulties with walking to the bus caused by winter weather. R. 1026–28. At home, she testified, her back pain and problems walking up and down stairs prevent her from washing dishes, making beds, mopping, and doing other household chores. R. 1032. She testified that she cannot stand for more than eight minutes without needing to sit down. R. 1032–33. She is separated from her husband, but she testified that he sometimes comes to her apartment to help around the home. R. 1032. Aside from frequent interaction with her immediate family and larger family gathering around the holidays, she has minimal social interaction. R. 1034.

In a thirteen-page decision dated June 6, 2016, the ALJ once again determined that Plaintiff is not disabled. R. 18–30. The ALJ's decision followed the five-step sequential process for determining disability prescribed by the Social Security Administration (SSA). R. 19–20. At step one, the ALJ concluded that Plaintiff met the insured status requirements through June 30, 2018, and that she has not engaged in substantial gainful activity since her amended alleged onset date of June 1, 2014. R. 20. At step two, the ALJ concluded that Plaintiff has four severe impairments: degenerative disc disease, osteoarthritis of the feet and knees, obesity, and affective disorder. R. 21.

At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 21–23. With regard to her physical impairments, the ALJ considered listing 1.04 (spinal disorders), as well as Social Security Ruling 02-1p, which requires the ALJ to

4

account for obesity throughout the sequential evaluation process. R. 21. With regard to her mental impairments, the ALJ considered listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders) and determined that Plaintiff did not have a sufficient combination of marked impairments and repeated episodes of decompensation to satisfy the "paragraph B" criteria for either listing. R. 21–22. Nor did the evidence support the existence of either listing's "paragraph C" criteria. R. 22–23.

The ALJ next assessed Plaintiff's RFC and found that she can perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). R. 23. That RFC finding is subject to several limitations:

> [T]he claimant is limited to pushing and pulling bilaterally with feet on an occasional basis and reaching overhead bilaterally on an occasional basis. She can utilize ramps or stairs occasionally. She should never use ladders or scaffolds. The claimant can stoop, kneel, crouch and crawl on an occasional basis. She should never work at unprotected heights or around moving mechanical parts. She is limited to performing simple, routine and repetitive tasks and making simple work-related decisions. She can respond appropriately to supervisors on a frequent basis. She can respond appropriately to coworkers and the public on an occasional basis. She can tolerate occasional changes in routine work setting. In addition to normal breaks, she would be off task less than 10% of the time in an eight-hour workday.

*Id.* In support of the RFC finding, the ALJ conducted a five and half page discussion of Plaintiff's testimony and medical records. R. 23–28.

At step four, the ALJ concluded that Plaintiff did not have any past relevant work experience because neither her work as a school bus driver nor her work as a nursery school supervisor rose to the level of substantial gainful employment (SGA). R. 28. The ALJ noted the VE's additional testimony that, even if those two jobs did constitute SGA, Plaintiff's RFC would preclude her from performing either. R. 28–29. At step five, the ALJ then further relied on the VE's testimony that

a person with Plaintiff's age, educational background, work experience, and RFC would be able to perform work that is available in significant numbers in the national economy. R. 29. Specifically, the VE testified that Plaintiff would be capable of performing work as a housekeeper, order filler, or building cleaner. *Id.* Accordingly, the ALJ found that Plaintiff is not disabled. R. 30. The Appeals Council denied her request for review of that new decision. R. 5. Plaintiff thereafter filed for review in this court.

## LEGAL STANDARD

The statute authorizing judicial review of decisions of the Commissioner of Social Security states that the findings of the Commissioner "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 404 U.S. 389, 401 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and his conclusion. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger*

*v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

Plaintiff contends that the ALJ's decision suffers from four errors: (1) the ALJ failed to properly evaluate the physical component of her RFC; (2) the ALJ failed to properly evaluate the mental component of her RFC; (3) the ALJ erred in his assessment of the opinions of Nurse Practitioner Amy Schott; and (4) the ALJ erred in his evaluation of Plaintiff's subjective allegations. The ALJ's alleged errors in evaluating Nurse Schott's opinions and evaluating Plaintiff's subjective allegations pertain to the ALJ's more general alleged errors evaluating Plaintiff's physical RFC. Accordingly, I will begin my analysis by addressing the ALJ's treatment of NP Schott's opinions and Plaintiff's subjective reports as part of my assessment of the ALJ's physical RFC finding.

### A. Plaintiff's Physical RFC

Plaintiff's primary argument is that the physical RFC articulated by the ALJ was not supported by substantial evidence. An RFC measures the most an individual can do despite the physical or mental limitations imposed by her impairments. SSR 96-8p, 1996 WL 374184, at *2. In forming an RFC, the ALJ must review all of the relevant evidence in the record, including any information about the claimant's symptoms and any opinions from medical sources about what she can still do despite her impairments. *Id.* The ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id.* at *5. A finding that a claimant has the RFC to perform "light work" means that the claimant can engage in the following activities:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, *a job is in this category when it requires a good deal of walking or standing*, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 1567(b) (emphasis added). By contrast, a finding that a claimant has the RFC to perform "sedentary work" means the claimant is capable of doing a job that "involves sitting" but for which "a certain amount of walking and standing is often necessary in carrying out job duties," meaning "walking and standing are required occasionally." *Id.* § 404.1567(a).

As Plaintiff points out, whether her RFC limits her to light or sedentary work is crucial in this case: "Due to her age, education, and work experience, Ms. Marx would be found disabled if she were found incapable of standing and walking for 6 hours per day and limited to sedentary work." Pl.'s Br., ECF No. 12 at 7 (citing 20 C.F.R. pt. 404, subpt. P, app. 2, tbl.1, r. 201.14). Listed in Table 1 of Appendix 2, Rule 201.14 provides that a claimant will be found to be disabled if she is closely approaching advanced age, has obtained at least a high school education that does not provide for direct entry into skilled work, and does not have any transferrable skills. 20 C.F.R. pt. 404, subpt. P, app. 2, tbl.1, r. 201.14. The explanation for this counter-intuitive rule is that most sedentary occupations fall into the skilled or above classification, and individuals approaching advanced age (age 50–54) may be significantly limited in the vocational adaptability needed to adjust to such work if they can no longer perform vocationally relevant past work and have no transferable skills. *Id.* at pt. 404, subpt. P, app. 2, § 201.00(a) and (g). In any event, the determination that Plaintiff was able to perform light work was outcome determinative under the circumstances of this case.

Plaintiff argues that in reaching this conclusion, the ALJ erred by relying on the October 2013 opinion of state agency medical consultant Dr. Shakoora Omonuwa—the only medical opinion to which the ALJ assigned any weight. Plaintiff contends that Dr. Omonuwa's opinion had become stale in light of medical evidence submitted between October 2013 and the February 2016 hearing, and she argues that the medical evidence from after October 2013 severely undermines Dr. Omonuwa's opinion. In particular, Plaintiff contends that Nurse Practitioner Schott's opinion that she is capable of performing no more than sedentary work more accurately reflects her condition. Plaintiff further suggests that, rather than rely on Dr. Omonuwa's October 2013 opinion, the ALJ should have requested an updated state agency opinion or ordered an evaluation of her RFC by another medical expert.

The ALJ assigned "some weight" to Dr. Omonuwa's opinion. R. 27. Dr. Omonuwa assessed Plaintiff as having several exertional limitations, checking boxes indicating that she is capable of carrying 20 pounds occasionally, carrying 10 pounds frequently, standing or walking for 6–8 hours during an 8-hour workday, and sitting for 6–8 hours during an 8-hour workday. R. 241. Dr. Omunuwa also noted that Plaintiff is limited in her ability to push and pull with her lower extremities, explaining that she is "limited to occasional bilateral lower due to pain and crepitus." *Id.* Next, Dr. Omunuwa assessed Plaintiff as having postural limitations preventing her from climbing ladders, ropes, and scaffolds "due to knees, back, [and] neck." R. 242. She also checked a box indicating that Plaintiff is limited in her ability to reach in all directions, with explanatory notes limiting "bilateral [to] occasional due to neck DDD" (degenerative disc disease) and apparently limiting "[l]eft overhead and right overhead." R. 243. Finally, with regard to environmental factors,

Dr. Omonuwa indicated that Plaintiff should "avoid concentrated exposure" to hazards, such as machinery and heights, "due to obesity." R. 244.

Dr. Omonuwa's report also includes two longer assessments regarding Plaintiff's impairments. With regard to the severity of Plaintiff's symptoms, Dr. Omonuwa opined: "Allegations of DDD, neck and back problems, urinary incontinence and muscle spasms are partially credible. X[-]rays confirm mdi of DDD of lumbar and cervical spine. The severity of symptoms are not supported by the [medical records of evidence]." R. 245. The assessment concludes with a narrative summary, which explains that Plaintiff's medical records "support[] knee tenderness," as well as "ongoing lumbar, cervical and knee symptoms supported by x[-]rays with MDIs for cervical and lumbar. Obesity impacts symptoms." R. 247.

Seventh Circuit precedent suggests that an ALJ errs by relying on outdated opinion evidence from state agency consultants despite the presence of significant evidence in the record that was either not available or not yet created at the time the consultant issued an opinion. *See Campbell v. Astrue*, 627 F.3d 299, 309 (7th Cir. 2010) (noting ALJ's error in relying on opinions of state agency psychiatrist and psychologist who did not have access to subsequently created medical records from treating psychiatrist); *see also Childress v. Colvin*, 845 F.3d 789, 791–92 (7th Cir. 2017) (characterizing as "essentially worthless" the opinions of two nonexamining state agency consultants who "had not had access to [the claimant's] full . . . medical record," and noting that the ALJ properly gave little weight to those opinions). A review of Plaintiff's medical records subsequent to Dr. Omonuwa's October 2013 opinion raises significant concerns about the value of that opinion.

Plaintiff's medical records from 2015 and 2016 indicate a significant deterioration in her physical condition, particularly her knees, and therefore seriously call into question whether she would be capable of walking or standing for 6–8 hours in a day, as Dr. Omonuwa opined in 2013. In April 2015, an x-ray indicated the presence of "[d]egenerative arthritis in both knees[,] greatest in the medial compartments bilaterally." R. 451. On June 11, 2015, Orthopedist Michael A. Schnaubelt of the BayCare Orthopedics and Sports Medicine Center saw Plaintiff for pain involving both knees, left knee greater than right. Plaintiff reported the onset of her knee pain was one year earlier. She reported pain in the medial aspect that was aggravated by going up and down stairs, rising after sitting, walking, and weather/temperature changes. She had been using a cane for four months due to knee pain and could walk a block, but it was very painful. She reported waking up crying due to knee pain. R. 556. Dr. Schnaubelt noted small effusion in both knees and positive meniscal signs on the left knee. X-rays revealed moderate medial space narrowing and osteophytes off the medial compartment of both knees. Dr. Schnaubelt diagnosed bilateral knee moderate osteoarthritis involving the medial compartment and counseled Plaintiff on appropriate exercises and activity restrictions. He gave her a cortisone injection and advised her that if it helped it could be repeated every three months. Dr. Schnaubelt also stressed the importance of weight loss to slow down the arthritis and the importance of non-impact activities and swimming. He told her that if her weight remained elevated (305 pounds) she would most likely need a knee replacement in the next 2 to 3 years. R. 556–57.

In August, Plaintiff returned to Dr. Schnaubelt with a report of constant knee pain with the left knee worse than the right. She reported the cortisone injection worked for about two months. She was taking Norco when necessary. R. 582. In September 2015, a Euflexxa injection with the

11

cortisone was tried in both knees. R. 595–96. A knee brace was also prescribed. R. 615. A December 18, 2015 note indicates Plaintiff's knee pain was continuing. At that time, Dr. Schnaubelt planned to repeat cortisone injection one more time, and if there was no benefit, the next step would be to discuss a knee replacement. R. 789. In the meantime, Plaintiff was given a prescription for a customized knee brace, Hydrocodone-acetaminophen (NORCO), and various other medications. R. 798–99. Finally, in April 2016, two months after the hearing, Dr. Schnaubelt reviewed x-rays that showed "complete bone-on-bone in both knees." R. 935. Though not available to the ALJ, the latter report was submitted to the Appeals Council.

Plaintiff was also having problems with her feet at this time. On April 30, 2015, she saw Dr. Chad Denamur, a podiatrist, for complaints of bilateral foot pain. She reported pain around the ankle and pointed to the area around the subtalar joint, with the right much worse than the left. She also reported pain on the medial arch of the right foot. R. 537. Plaintiff reported it was painful to walk, and she kept her foot elevated at home. R. 533. Dr. Denamur assessed sinus tarsi syndrome and posterior tibial tendon dysfunction, right foot, and tendinitis. He applied bilateral arch padding and strappings, prescribed an anti-inflammatory, and recommended she obtain Spenco orthotics. R. 537–38. Plaintiff's pain continued, and on June 7, 2015, Dr. Denamur prescribed a Cam boot and increased arch support. R. 548. When her pain complaints continued, Dr. Denamur prescribed a walker with a seat on it for her on August 11, 2015. R. 572.

A November 2015 MRI also showed "[w]orsening chronic low back pain" arising out of "[m]ild spondylosis and lower lumbar disc disease with small left central protrusion at L4–5" and "[m]ild left neural foraminal encroachment at L3–4." 632–33. Also throughout this period of time,

Plaintiff was undergoing physical therapy with little to no improvement. R. 636–79. None of these reports were in existence at the time Dr. Omonuwa issued her opinion based on her review of the file.

As mentioned above, the record also includes evidence from Nurse Practitioner Amy Schott submitted subsequent to Dr. Omonuwa's October 2013 opinion. The regulations in force at the time Plaintiff filed her claim separated medical evidence into two categories: "acceptable medical sources" and "other sources." Acceptable medical sources were limited to licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a). "Other sources" included other medical sources such as nurse practitioners. *Id.* § 404.1513(d). Under the previous regulations, only "acceptable medical sources" could give medical opinions and be considered treating sources. *Id.* § 404.1527(a)(2); SSR 06-3p. However, an ALJ could rely on opinions from other medical sources to determine the severity of a claimant's impairments and the extent of any limitation on the claimant's ability to work. *Id.* § 404.1513(d). In deciding how much weight to give "other medical sources," an ALJ could apply the same kinds of factors that are used to evaluate acceptable medical sources. SSR 06-3p. SSR 06-3p explains that "the adjudicator generally should explain the weight given to opinions for these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.*

Here, NP Schott is apparently the only person who provided an opinion regarding Plaintiff's exertional capabilities subsequent to October 2013. In a letter dated April 23, 2015, NP Schott explained that Plaintiff "suffers from osteoarthritis pain in several areas of her body" and opined that,

"[d]ue to this, [Plaintiff] needs to have a job/duty that allows her to sit down most of the time to help alleviate the pain." R. 424. NP Schott followed this with another letter dated October 16, 2015, stating that Plaintiff "is a patient of [hers], with multiple health concerns, the least of which include extensive musculoskeletal difficulties, which can affect balance and stamina." R. 423. The letter then stated that "[i]t is in [Plaintiff's] best interest to have someone accompany her when using assisted transportation." *Id.* The record also contains a longer letter dated January 11, 2016:

> [Plaintiff] has multiple health issues, including but not limited to degenerative changes to knee, back, neck and ankles. This unfortunately limits her activity tolerance, preventing her from standing, or even sitting, for any prolonged period of time. Though she is able to perform sedentary work, frequent change of position would. [sic]
>
> With her chronic pain, she has secondary issues, including limitations in focus, concentration and task follow-through.
>
> She has been very active in her health care, attending appointments as requested, using medication appropriately and attending physical therapy as recommended. She has also been seen by orthopedics, who has been working to obtain appropriate orthotics for both knees and ankles to improve her function, even a bit, making her ADL's more manageable.
>
> Ultimately, the above combination of health issues may result in attendance issues. At this time, I do not see her situation improving to any degree, that would make her an appropriate candidate for full time, functional work, beyond limited sedentary levels.

R. 727.

The ALJ assigned little weight to NP Schott's opinions. R. 27. He first explained that he discounted the opinion in the April 2015 letter because NP Schott issued it after seeing Plaintiff for only a single appointment. *Id.* (citing R. 492). But while that may have been true for the April 2015 letter, it did not apply to the October 2015 and especially the January 2016 letters. By that time, Dr. Schnaubelt had unsuccessfully tried cortisone injections and a customized knee brace, and concluded

that Plaintiff was likely a candidate for knee replacement. In addition, Dr. Denamur had tried orthotic inserts and a specialized boot, and finally prescribed a walker for her. Plaintiff had also unsuccessfully tried physical therapy. The 2015 treatment history provided strong support for NP Schott's opinion.

The ALJ also concluded that NP Schott's opinion that Plaintiff should be limited to sedentary work was inconsistent with the medical examination evidence indicating that Plaintiff has intact neurological functions and normal muscle strength, muscle tone, coordination, and gait. R. 28 (citing R. 316–41, 517–627, 758–67). The ALJ relied on these same physical findings as the reason for discounting Plaintiff's statements concerning the symptoms she experienced, particularly pain, as a result of her physical impairments. Noting that "[e]xaminations generally reflect intact musculoskeletal and neurologic function with intact gait, strength, sensation and muscle tone," the ALJ concluded that these findings were consistent with an ability to perform light work and inconsistent with Plaintiff's allegations of disabling symptoms. R. 24. In defense of the ALJ's analysis, the Commissioner argues that Social Security Ruling (SSR) 16-3p "makes clear that medical evidence is an important consideration in symptom evaluation. Clinical findings of normal gait, normal strength, intact sensation, and negative straight-leg raising all tend to cut against claims of disabling back pain . . . and can constitute substantial evidence." ECF No. 21 at 13.

It is true that SSR 16-3p states that findings on physical examination can, under some circumstances, serve as a justification for rejecting a claimant's allegations of a severe and debilitating physical impairment. The Ruling offers the example of "an individual with reduced muscle strength who indicates that for the last year pain has limited his or her standing and walking to no more than a few minutes a day would be expected to have some signs of muscle wasting as a

result." 2017 WL 5180304, at *5. The Ruling then states: "If no muscle wasting were present, we might not, depending on the other evidence in the record, find the individual's reduced muscle strength on clinical testing to be consistent with the individual's alleged impairment-related symptoms." *Id.*

That analysis seems inapplicable in a case such as this, however, where the claimant is not alleging an inability to stand or walk more than a few minutes a day. The question here is whether Plaintiff had the ability to stand and/or walk for a good part of an eight-hour day from the alleged onset date through the date of the ALJ's decision. The medical records described above reveal a significant deterioration over that time in the physical condition of Plaintiff's knees and feet, no doubt exacerbated by her obesity, that raises a serious question about her ability to stand and walk for a significant part of the day. It is not clear that findings as to her gait, strength, sensation and muscle tone from prior examinations are inconsistent with the degree of pain she allegedly experienced in her knees and lower extremities, particularly in view of the fact that the deterioration was relatively recent and she had been instructed to perform non-impact exercises, like swimming, as part of her physical thereapy. Certainly, the doctors that treated her found no inconsistency. Absent a medical source opinion suggesting otherwise, the ALJ's finding of inconsistency cannot stand.

The ALJ further saw inconsistency between NP Schott's opinion that Plaintiff needs assistance using public transportation and Plaintiff's testimony that she independently uses public buses, such as when going to the pool. *Id.* Finally, the ALJ concluded that NP Schott's opinion that Plaintiff would have attendance problems was speculative and had no basis in the record. *Id.* But it is not clear how using public transportation translates into the ability to remain on one's feet for

16

a good part of an eight-hour day. And even without attendance problems, Plaintiff would be precluded from light work if she could not remain on her feet for a good part of the day.

In sum, I conclude that the medical evidence for the period after October 2013 severely undermines Dr. Omonuwa's opinion regarding Plaintiff's exertional abilities. By relying on Dr. Omunuwa's opinion to assess Plaintiff's RFC as the ability to do light work, the ALJ implicitly adopted Dr. Omonuwa's opinion that Plaintiff was capable of remaining on her feet for much of an eight-hour day. Yet medical evidence from throughout 2015 and into 2016—dates *after* Plaintiff's amended alleged onset date in June 2014—seriously calls into question Plaintiff's ability to stand and walk with that frequency. And in assigning little weight to NP Schott's opinion, the ALJ looked past the supporting medical evidence of Plaintiff's limited physical capabilities, an error that he then repeated when evaluating Plaintiff's subjective reports of pain. Because the ALJ opinion adopts an RFC based primarily on a medical opinion that predates Plaintiff's amended alleged onset date and discounts the only opinion of the only health care professional that considered the more recent evidence, as well as Plaintiff's own statements concerning her limitations, based on unsupported assumptions about previous medical findings, I conclude that it was not supported by substantial evidence.

## B. Plaintiff's Mental RFC

Plaintiff's argument regarding the mental component of her RFC is somewhat confusing. She argues that the limitations on her mental RFC identified by the ALJ were not supported by substantial evidence. In particular, she takes issue with the ALJ's assignment of "little weight" to the opinion of state agency psychological consultant Dr. James Mullins, which she contends means that the ALJ did not otherwise rely on substantial evidence in articulating her mental RFC. She

further contends that the ALJ did not provide any explanation for the limitations to being off task up to ten percent of the time, making simple work related decisions, frequently responding appropriately to supervisors, and tolerating occasional changes in routine work settings. Finally, she contends that, despite finding that she has moderate difficulties in maintaining concentration, persistence, and pace, the ALJ failed to incorporate that finding into her RFC by limiting her to "simple, routine and repetitive tasks."

The argument is confusing because if the ALJ's findings of mental limitations are not supported by substantial evidence, then the proper conclusion to draw would seem to be that Plaintiff has no mental limitations. This follows because an ALJ's finding cannot stand if it is not supported by substantial evidence. *Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Moreover, it is the claimant's burden to prove she is disabled. 20 C.F.R. § 416.912(a). Absent evidence of a functionally limiting impairment, a claimant cannot be found disabled. Thus, if there is insufficient evidence to support the ALJ's finding of mental limitations, the ALJ's finding of such a limitation cannot stand.

Such an argument would not help Plaintiff's case. If Plaintiff has no mental limitations, how is she harmed by the ALJ's erroneous finding that she does have mental limitations and thus a more limited RFC? The more limited her RFC, the more likely a finding of disability. Take, for example, the ALJ's finding that Plaintiff would be off task up to ten percent of the time "given [her] pain complaints and her affective disorder." R. 27. Plaintiff contends that the ALJ provided no support for this finding, and it is true that no medical source opined that she was less able to keep her mind on her job due to a mental impairment than any other person in the workforce. The ALJ seems to have inferred the need for such a limitation in her functional capacity from her testimony and her

18

statements to her doctors and therapists about her pain and her difficulties. If, as Plaintiff contends, this is insufficient evidence to support such a limitation, then it would seem there might be even more jobs Plaintiff is capable of performing. It therefore seems contrary to her own interest that Plaintiff chooses to argue that the ALJ's finding of a ten percent off-task limitation is not supported by substantial evidence. Of course, the point Plaintiff actually wants to make is that the off task limitation should be higher, thereby precluding her from gainful employment in the opinion of the VE. But if the evidence is insufficient to support a ten percent off task limitation, it is hard to see how it could support a higher percentage limitation.

Plaintiff likewise criticizes the ALJ's assessment of Dr. Mullins, the state agency consultant who reviewed her file in October 2013 to assess her allegations that she experiences depression, anxiety, and memory loss. R. 227. Dr. Mullins assessed Plaintiff as having only one medically determinable impairment—depression—and he found that depression caused only mild limitations on Plaintiff's activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence, and pace. R. 229, 236. As a result, Dr. Mullins found that Plaintiff's depression was not severe. R. 227. The ALJ explained that he assigned little weight to Dr. Mullins' 2013 opinion because Plaintiff's more recent medical records "reflect persistent symptoms with an ongoing need for treatment with mental health professionals." R. 28. Plaintiff argues that, in giving little weight to Dr. Mullins' opinion, the ALJ left his finding that she had limitations resulting from a mental impairment without evidentiary support. ECF No. 12 at 10. But had the ALJ credited Dr. Mullins' opinion, he would have found Plaintiff had no severe mental impairment and likely would have concluded that Plaintiff had no functional limitations caused by her depression that would render her incapable of holding a job. Instead, the ALJ found from other more recent evidence in

the record, namely, the records from the Brown County Human Services Department Community Services Program, that she did have a severe mental impairment. R. 26, 28. These treatment records arguably constitute substantial evidence of a mental impairment.

The more difficult issue concerns the basis for the ALJ's findings concerning the limitations caused by Plaintiff's mental impairment and his translation of those limitations into the RFC. As noted, no medical source opined that Plaintiff had more than mild limitations due to her mental impairment. The ALJ appears to have nevertheless concluded from his review of her function report and mental health treatment records that Plaintiff had moderate difficulties in social functioning and with regard to concentration, persistence, and pace (CPP). R. 22.

Regardless of whether the evidence compels a finding that Plaintiff has moderate difficulties with CPP, having made it, it was incumbent upon the ALJ to include it in his RFC and in the hypothetical question posed to the VE. *Yurt v. Colvin*, 758 F.3d 850 (7th Cir. 2014). The ALJ purported to do so by limiting Plaintiff to "simple, routine and repetitive tasks and making simple work-related decisions," and a 10% off-task limitation. R. 23. This language would seem sufficient to capture the limitation in CPP found by the ALJ, particularly since it is the ALJ's responsibility at this stage to assess the claimant's RFC. 20 C.F.R. § 416.946(c). But in a series of cases, the Seventh Circuit has found fault with ALJs who translate moderate limitations in CPP to an ability to perform simple and routine jobs. *See Yurt*, 758 F.3d 850, 858–59 (7th Cir. 2014) ("[W]e have repeatedly rejected the notion that a hypothetical . . . confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace."); *see also O'Connor–Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010) (collecting cases which have held that terms like "simple, repetitive tasks" have been

held not to encapsulate moderate limitations in CPP). On the other hand, where a medical source opines that, notwithstanding a claimant's moderate limitations with CPP, a claimant can nevertheless perform a job involving only simple, routine, and repetitive tasks without the stress of a fast paced assembly line or hourly quotas, the court has suggested that this may suffice. *Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015) (holding that, "in some cases, an ALJ may rely on a doctor's narrative RFC, rather than the checkboxes, where that narrative adequately encapsulates and translates those worksheet observations"). Given the additional and more recent evidence concerning Plaintiff's mental impairment, the Commissioner should consider having a state agency consultant or other medical source complete a mental RFC to provide the ALJ with an evidentiary basis for findings in this area.

## CONCLUSION

For the reasons given above, the decision of the Commissioner is **REVERSED** and **REMANDED** to the SSA pursuant to 42 U.S.C. § 405(g) (sentence four) for further proceedings consistent herewith. The Clerk is directed to enter judgment forthwith.

**SO ORDERED** this 23rd day of March, 2018.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court

21